RAND v CIVIL SERVICE COMMISSION

1. COURTS—ADMINISTRATIVE LAW—AGENCY STANDARDS—RELATIONS
    WITH EMPLOYEES.

    The courts will hold an administrative agency to the standards
    which it has established to govern its own relationships with
    government employees.

2. CIVIL RIGHTS—EMPLOYMENT—JOB REQUIREMENTS—RELATIONSHIP
    TO EMPLOYMENT—STATUTES.

    A job requirement that operates to exclude a disproportionate
    number of a particular race violates the Federal Civil Rights
    Act unless it is shown that the requirement has a manifest
    relationship to the employment in question (42 USCA 2000e, et
    seq.).

3. CIVIL RIGHTS—EMPLOYMENT—EMPLOYMENT SELECTION PROCEDURES
    —BURDEN OF PROOF—STATUTES.

    A party challenging an employment selection procedure as viola-
    tive of the Federal Civil Rights Act has the initial burden of
    showing that the procedure is in fact discriminatory (42 USCA
    2000e, et seq.).

4. CIVIL RIGHTS—ADMINISTRATIVE LAW—AGENCY RULES—NONCOMPLI-
    ANCE WITH RULES—EMPLOYMENT TESTS—BURDEN OF PROOF.

    A state agency which seeks to invoke the Federal Civil Rights Act
    to excuse the agency's noncompliance with agency rules regard-
    ing employment tests should have the initial burden of showing
    that the testing procedure is a discriminatory one (42 USCA
    2000e, et seq.).

5. ADMINISTRATIVE LAW—DEPARTMENT OF CIVIL SERVICE—DEPART-
    MENT OF CORRECTIONS—EMPLOYMENT PROCEDURES—DEPART-
    MENTAL DISCRETION.

    A decision that a test used by the Department of Corrections and
    the Department of Civil Service is invalid and that its results
    should be ignored should not be within departmental discre-

REFERENCES FOR POINTS IN HEADNOTES
[1] 1 Am Jur 2d, Administrative Law § 117 et seq.
[2–6] 15 Am Jur 2d, Civil Rights § 57.

tion; the Department of Civil Service, when its actions are challenged, must present evidence to support a departure from its established employment procedures.

6. Administrative Law—Department of Civil Service—Employment Procedures—Agency Rules—Civil Rights—Discrimination.

A statement of an examination technician that an employment test was a "paper and pencil I.Q. test" and a letter from the departmental personnel director expressing his feeling that the test could have been culturally biased are not sufficient evidence to support a finding that the test was discriminatory; the Federal Civil Rights Act does not provide the Department of Civil Service with a basis for ignoring the results of the test in violation of its own rules without proper evidence that the test is a discriminatory one (42 USCA 2000e, *et seq.;* CSC Rule 18.3b).

Appeal from Ingham, Ray C. Hotchkiss, J. Submitted April 14, 1976, at Lansing. (Docket No. 22994.) Decided October 18, 1976.

Nevalee Rand and Gloria Powell filed grievances with their employer, the Department of Corrections, for the failure of the department to withhold certification against two other employees for the position of Corrections Officer. The hearing officer refused to find a valid grievance in the department's failure, but found that the plaintiffs had valid grievances against the Department of Civil Service for its failure to follow its own procedure of giving an oral examination. Plaintiffs sought review by the Civil Service Commission, which affirmed. Plaintiffs then appealed to circuit court, which affirmed. Plaintiffs appeal by leave granted. Reversed and remanded.

*Fraser, Trebilcock, Davis & Foster* (by *Robert W. Stocker, II),* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A.*

*Derengoski,* Solicitor General, and *Varda N. Fink,* Assistant Attorney General, for defendants.

Before: R. M. MAHER, P. J., and M. F. CAVANAGH and BEASLEY, JJ.

R. M. MAHER, P. J. Plaintiffs sought review of a decision of the Civil Service Commission, pursuant to the Administrative Procedures Act, MCLA 24.201, *et seq.;* MSA 3.560(101), *et seq.* From an order of the Ingham County Circuit Court affirming the commission's decision, plaintiffs appeal to this Court. We reverse.

In 1969, the Department of Civil Service placed female prison security personnel under the classification of Hospital Security Attendant 04. The Department of Corrections hired two females as Hospital Security Attendants 04 to work at the state prison at Jackson. On October 19, 1971, plaintiff Nevalee Rand, then a typist clerk at the prison, applied to Ray Kraft, personnel officer of the prison, for consideration in filling rumored new female vacancies in the Hospital Security Attendant 04 classification. Plaintiff Rand was on the then current register of eligibles for this classification, but the register was to expire on October 28, 1971.

To qualify for a new register, plaintiff Rand took a Hospital Security Attendant 04 examination on November 13, 1971. On January 4, 1972, she was notified that her score of 92% on the examination made her eligible for the Hospital Security Attendant 04 position.

On December 5, 1971, the Department of Corrections provisionally appointed Betty J. Scott and Dorothy Caddell to two vacant Hospital Security Attendant 04 positions at Jackson prison. Both women are black. At the time of their appoint-

ments, no register for the position had been compiled. Neither Scott nor Caddell had taken the Hospital Security Attendant 04 examination.

On January 15, 1972, plaintiff Gloria Powell, then a clerk at Jackson prison, took the Hospital Security Attendant 04 examination. She received a rating of 80%, placing her within the certifiable range for the position.

The provisional appointees Scott and Caddell took the Hospital Security Attendant 04 examination on March 11, 1972. Both failed to achieve a grade within the certifiable range. Under rule 18.3b of the Rules of the Civil Service Commission, the test results should have led to certification against Scott and Caddell and termination of their provisional appointments. The rule states:

"The appointment of a provisional employee shall not be terminated by certification until he has had an opportunity to take an examination for the position. Any provisional employee who fails to pass sufficiently high to be within certifiable range, or who has had an opportunity to take such an examination and has not availed himself thereof, shall be certified against."

On May 26, 1972, Clifford S. Davis, Personnel Director for the Department of Corrections, requested in a letter to Sidney Singer, Director of the Department of Civil Service, that the two provisional employees be kept on the payroll. The letter expressed Davis' "feeling" that the examination for Hospital Security Attendant 04 "could have been culturally biased".

Shortly thereafter, the Department of Civil Service informed Davis that certification against Scott and Caddell was being withheld. On June 7, 1972, the Classifications Division of the Department of Civil Service advised Davis that the classification

of Corrections Officer 05 would no longer be limited to men only. The Classifications Department then, on June 18, 1972, reallocated the Hospital Security Attendant 04 positions held by Scott, Caddell and two other female employees to the Corrections Officer 05 classification. The reason given for the change of classification was that the Corrections Officer 05 classification was more descriptive of the women's duties.

On June 2, 1972, a new examination for the Corrections Officer 05 classification was announced. Under the "examination" procedure announced by the Department of Civil Service, all applicants over 21 years of age with a high school diploma or its equivalent received a certifiable score of 70%. The Department of Corrections would then conduct an oral appraisal for a final evaluation of all eligible applicants.

Plaintiffs Rand and Powell applied for a position within the Corrections Officer 05 classification. Scott and Caddell did not immediately apply for status under the classification, nor did they apply to take the examination until after they had been provisionally appointed to the position. On July 20, 1972, the Department of Civil Service notified plaintiffs Rand and Powell that the classification of Scott and Caddell had been changed to provisional Corrections Officer 05. Plaintiffs then filed grievances with the Department of Corrections. The basis for their grievances was the earlier decision to withhold certification against Scott and Caddell.

On September 19, 1972, a hearing on the grievances was held before hearing officer Arthur Neef. At the hearing, the plaintiffs argued that the provisional appointment of Scott and Caddell to the Corrections Officer 05 positions violated Civil

Service Rule 18.3b. The hearing officer found that while the Hospital Security Attendant 04 classification did not describe the responsibilities of the position plaintiffs sought, neither did the substituted Corrections Officer 05 classification. The obvious purpose for the classification change was to avoid rule 18.3b; Scott and Caddell had not failed the examination for Corrections Officer 05. None of the parties argues to this Court that the classification change had any effect on plaintiffs' grievances. We will consider it only as evidence of deviousness on the part of the Department of Civil Service.

The hearing officer found that plaintiffs have a valid grievance against the Department of Civil Service for its "failure to promptly follow the new procedure announced in June to give them [plaintiffs] and the provisional employees the oral examination substituted for the written test". The hearing officer, however, refused to find a valid grievance in the plaintiffs' objection to the failure to certify against the provisional employees. It is this refusal that caused plaintiffs to seek review of the hearing officer's decision.[1] The Civil Service Commission affirmed the hearing officer's decision.

An administrative agency, in addition to following constitutional and statutory mandates, must also comply with its own rules. Courts will hold an agency to the standards it has established to govern its relationships with government employees. *Service v Dulles,* 354 US 363; 77 S Ct 1152; 1 L Ed 2d 1403 (1957), *Vitarelli v Seaton,* 359 US 535; 79

---

[1] We have doubts about the appropriateness of using unstructured oral appraisals as the crucial factor in deciding who should be hired for a civil service position. The possibility of objective review of the decision whether or not to hire seems slight under this procedure. It is apparent that objective review underlies the competitive examination requirement of Const 1963, art 11, § 5.

S Ct 968; 3 L Ed 2d 1012 (1959), *Dillon v Lapeer State Home & Training School,* 364 Mich 1, 21; 110 NW2d 588 (1961) (concurring opinion), *Michigan Civil Service Commission v Local 1342, AFSCME, AFL-CIO,* 32 Mich App 104; 188 NW2d 219 (1971), 1 Cooper, State Administrative Law, 270–272. We must consider plaintiffs' claim that the department, without legitimate reason, disregarded rule 18.3b.

Had the rule been followed, Scott and Caddell would have been terminated for failure to pass the examination for the position they provisionally held. Defendants argue that because the examination for the position was a paper and pencil I.Q. test and had not been validated according to 29 CFR 1607,[2] the examination results could not be the basis for terminating the two black employees, notwithstanding the provisions of rule 18.3b. Termination of Scott and Caddell, defendants argue, would violate Title VII of the 1964 Civil Rights Act, 42 USCA 2000e, *et seq.,* applicable to the states since 1972.

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin * * * ". 42 USCA 2000e-2(a)(1). Even the use of seemingly

---

[2] The Equal Employment Opportunity Commission, in 29 CFR 1607, has issued guidelines for employers seeking to determine, through professional validation studies, whether the employment tests they use are job related. EEOC guidelines are an "administrative interpretation of the act by the enforcing agency * * * entitled to great deference". *Griggs v Duke Power Co,* 401 US 424, 433–434; 91 S Ct 849; 28 L Ed 2d 158 (1971). A validated test is one shown to be "predictive of or significantly correlated with important elements of work behavior which compromise or are relevant to the job or jobs for which candidates are being evaluated". 29 CFR 1607.4(c).

neutral barriers to employment violate this provision against discrimination. In the leading case of *Griggs v Duke Power Co,* 401 US 424; 91 S Ct 849; 28 L Ed 2d 158 (1971), the Supreme Court held that a job requirement that operates to exclude a disproportionate number of a particular race violates Title VII unless it is shown that the requirement has a manifest relationship to the employment in question.

"The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." 401 US at 431.

In the recent case of *Albemarle Paper Co v Moody,* 422 US 405; 95 S Ct 2362; 45 L Ed 2d 280 (1975), the Supreme Court again considered the validity of a testing program that discriminated against black applicants. The opinion makes it clear that the party challenging an employment selection procedure as violative of Title VII has the initial burden of showing that the procedure is in fact discriminatory. The majority opinion by Justice Stewart states:

"In *Griggs v Duke Power Co,* 401 US 424 [91 S Ct 849; 28 L Ed 2d 158] (1971), this Court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets "the burden of showing that any given requirement [has] * * * a manifest relationship to the employment in question." *Id,* at 432 [91 S Ct at 854; 28 L Ed 2d at 165]. This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination, *i.e.,* has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the

pool of applicants. See *McDonnell Douglas Corp v Green,* 411 US 792, 802 [93 S Ct 1817; 36 L Ed 2d 668] (1973)." 422 US at 425.

We think the same initial burden should be placed upon the state agencies here when Title VII is invoked to excuse noncompliance with applicable agency rules. A leading study on which the agencies rely, Cooper and Soble, *Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria for Hiring and Promotion,* 82 Harv L Rev 1598 (1969), argues for placing the burden upon the party challenging a particular testing procedure.

"A court should determine first whether in fact the test has a significant adverse impact on the minority group represented by plaintiffs—*i.e.,* whether the plaintiff class scores less well than persons outside the class. If it has no such impact, the test may actually benefit minority groups by eliminating the vagaries of subjective decision-making. Because of this possibility, the burden should be on the party challenging the test to show its adverse impact. This can be done by examining the relative scoring of whites and blacks who took the test at the employer's plant if there is a sufficient volume of experience there, or, if there is not, by examining the relative scoring of blacks and whites on the test elsewhere. Where no statistical evidence is available, adverse impact could be inferred from evidence of the academic and cultural content of the test questions." *Id* at 1664.

We therefore hold incorrect the statement of the trial court that "[i]t is a matter of discretion for the Department of Corrections and the Department of Civil Service to determine that their employment test is invalid and [that its results] should be disregarded". In view of the heavy responsibility imposed upon the Civil Service Com-

mission by the constitution, Const 1963, art 11, § 5, and implemented by its own detailed rules, there must be evidence to support a departure from established procedure. To allow departure from established civil service rules at an administrator's discretion would increase, not eliminate, "the vagaries of subjective decision-making".

The only evidence presented to support defendants' position that the test which Scott and Caddell failed was discriminatory is the statement of an examination technician from the Department of Civil Service that the test was a paper and pencil I.Q. test[3] and Davis' letter expressing the feeling that the test could have been culturally biased. This is not enough. See *Hester v Southern R Co*, 497 F2d 1374 (CA 5, 1974), *Adams v Texas & Pacific Motor Transport Co*, 408 F Supp 156, 161–162 (ED La, 1975). A copy of the test was not offered for examination by the hearing officer or by the court below. No statistical evidence was offered to show that members of a particular race did poorly on the test. It is not surprising, then, that there is no finding made below, by either the hearing officer or the trial court, that the test for Hospital Security Attendant 04 was discriminatory. Without such a finding, or at least evidence that would support such a finding, Title VII does not provide the Department of Civil Service with a basis to avoid its own rule 18.3b.

Our position here should not be taken as encour-

---

[3] In *Griggs, supra,* the Court found use of the Wonderlic Personnel Test and Bennett Mechanical Comprehension Test to screen applicants for a job with a North Carolina power company to be racially discriminatory. We have no way of determining what similarities there are between these tests and the test for Hospital Security Attendant 04. Another employment barrier found offensive in *Griggs* was a high school diploma requirement. The "examination" for the Corrections Officer 05 position announced by the Department of Civil Service required a high school diploma or its equivalent.

agement of civil service testing procedures that do not accurately gauge probable job performance. The Department of Civil Service should see to it, *prior* to administering any examination, that the examination is designed to select the persons best qualified for a particular position. But under Federal law, which defendants invoke as a justification for their actions, the relevancy of employment screening devices only becomes an issue after the discriminatory impact of those devices has been shown. Federal law does not prohibit all irrelevant employment tests; it only prohibits tests that do not predict job performance with some accuracy if they are also discriminatory.

Finding that defendants have not justified their departure from rule 18.3b, we hold that plaintiffs had a valid grievance. The court below erred in upholding the commission's decision. We remand for a determination of appropriate relief, including instatement of plaintiffs in the position from which they were wrongfully excluded and an award of back pay.

Reversed and remanded.